CHARLES G. HUTCHINSON

*v.*

JENNIE C. HUTCHINSON.

*Opinion filed April 16, 1902—Rehearing denied June 5, 1902.*

1. MARRIAGE—*if marriage actually exists, subsequent admissions have no effect.* If the relation of lawful marriage has actually been created, the subsequent admissions of the wife to the contrary, no matter if solemnly and deliberately made, can have no effect to dissolve the marriage tie or relieve the other party from the obligations and duty of a husband and father.

2. The court reviews the evidence in this case at length, and holds that it establishes all the elements necessary to a common law marriage *per verba de presenti,* followed by cohabitation matrimonial in character and intent, and a full assumption of the marriage status in every legal aspect.

*Hutchinson v. Hutchinson,* 96 Ill. App. 52, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. E. W. BURKE, Judge, presiding.

FRANK P. BLAIR, (JAMES MAHER, and L. A. GILMORE, of counsel,) for appellant.

BANGS, WOOD & BANGS, for appellee.

Mr. JUSTICE BOGGS delivered the opinion of the court:

The circuit court of Cook county, on the hearing of a bill in chancery for separate maintenance filed by the appellee, found and declared that the appellant and the appellee were husband and wife and that the appellee was living separate and apart from the appellant, her husband, without her fault, and decreed that appellant should pay appellee $100 per month for the support of herself and their daughter Violet, the youngest child of the parties. An appeal prosecuted by the appellant re-

sulted in an affirmance of the decree in the Appellate Court for the First District. A further appeal in the same behalf has brought the record into this court.

The parties were never united in marriage by any ceremonial or public solemnization of the marriage rite between them. The finding of the circuit court was that they came together and agreed by a present contract to accept each other as husband and wife, and thereafter entered into the marriage relation and lived and cohabited together as husband and wife. The appellant admitted the cohabitation substantially as charged, conceded he had become the father of four children born to the appellee as the result of such cohabitation, but denied that any contract of marriage, *per verba de presenti* or otherwise, had ever been entered into between them or that any undivided repute of such marriage ever existed, but insists that his intercourse with her was purely meretricious and never matrimonial. The relation between them at its inception was illicit. It began in the year 1867, while appellee, a young girl, was a servant in the home of appellant's father, in the city of Chicago. The appellant, then a young man, made his home with his father. Appellee became pregnant with child—the fruit of their illicit intercourse. She testified he then promised to make her his wife and fixed a time when they would be married. He, however, went away from his home and she went to the home of her sister and instituted proceedings in bastardy against him, which he, with the aid of his father, settled by payment to her of $100 in cash and giving to her nine notes, each for the sum of $50, one of which fell due each year thereafter for nine years. Appellee was delivered of this child on the 8th day of July, 1868. The child was a daughter, and was given the mother's name, which was Jennie. Soon after the birth of this child the parents resumed their illicit intercourse, which continued until the year 1874, when appellee again became pregnant. The appellee testified that during this

time the appellant made repeated promises of marriage, and that when it became evident that she was again pregnant with another child of which he was the father, she insisted that the second child should not be born out of lawful wedlock; that he consented, and that a contract of marriage was verbally entered into between them in the month of April, 1875. Her testimony as to this contract of marriage was as follows: "Why, Mr. Hutchinson came to see me one evening. I felt rather blue and downhearted. He asked me what was the matter, and I said, 'You know what is the matter.' He said, 'I do.' He says, 'Is that all?' I said, 'Yes.' He looked at me for awhile, and he says, 'Jennie, are you willing to be my wife?' I said, 'Yes.' He took a ring out of his pocket and he placed it on my finger, and he said, 'I now take you for my wife.' I said, 'I now take you for my husband.' He put his arms around my neck and kissed me, and he said, 'Are you satisfied with that?' I said, 'Yes.' He says, 'From this night we are husband and wife.' 'Now,' he says, 'You go and get a flat and we will go housekeeping.' I says, 'I cannot leave mother just now, because she is on the point of death.' 'Well,' he says, 'as soon as you can.' I says, 'All right.'" Appellant denied these statements of the appellee, but the chancellor, who saw them both and heard them both testify, accepted her version as being true. No reason is perceived why we should insist the court fell into palpable error in regarding her as the more truthful of the two. In the light of all the testimony bearing upon the character of the appellant we heartily agree with the chancellor that of the two her statements are the more worthy of weight and credit.

The appellee testified that within about a month after the contract of marriage was entered into between them, and in pursuance of that contract, she left her home with her father and mother, and with the appellant as her husband began living together as husband and wife in a flat at 286 West Congress street, in the city of Chicago;

that their child Jennie resided in the family with them; that their second child was born while they so lived together in said flat, on the 17th day of August, 1875; that this child, a boy, was given the name of its father, Charles G. Hutchinson; that they resided together at the same place for a year and a half and then moved to West Lake street, where they continued to live and cohabit together as husband and wife for nine years and until the year 1884, during which time two other children, Grace and Violet, were born of their union; that soon after the birth of the fourth child he practically abandoned his home with her and their children, and, beyond the payment of sums not exceeding $50 per year, failed and refused to provide for the wants of herself or of the children.

The facts and circumstances bearing upon the life and conduct of appellant and appellee, and upon the question of the character of their cohabitation and the repute of their association among their neighbors and acquaintances, during the period of years intervening between April, 1875, the date when appellee testified the contract of marriage was entered into, and the year 1884, when she testified he deserted and abandoned her and their children, and the somewhat conflicting testimony bearing thereupon, to which counsel devote so many pages of their printed briefs, cannot be taken up *seriatim* and discussed without extending this opinion to an unreasonable length, nor would any benefit accrue from such discussion to the parties, their children, their counsel, the public or the profession. We patiently listened to the very full and forcible oral arguments of counsel, and have diligently read their printed briefs and arguments and freely consulted the testimony preserved in the record, and the result of our reflection and deliberation has only served to confirm in our minds the correctness of the views expressed by the Appellate Court as to the facts established by all the proofs upon these questions.

We therefore approve the following extract from the opinion of that court rendered by Mr. Justice WINDES:

"During all the time appellee lived at these different places, and up to the year 1884, when he entirely left and abandoned appellee and his children, he lived and cohabited with her and to all outward appearances sustained to her the relation of husband, though he was frequently absent from home, as he explained to her and to his children, on account of business or on hunting and fishing expeditions, as long as six weeks at a time. During that time appellant was known by certain of the friends and acquaintances of himself and appellee as her husband. He acknowledged all the four children as his own, always permitted them, without any remonstrance or objection, to call him papa and father, and when at home with appellee and his children he always occupied the same bed with appellee. He spoke to different persons of appellee as his wife. From 1875 to 1881, when he died, appellee's father lived in the same house with her, appellant and their children. Appellee says that some people called her Jennie Curtis at that time because her father lived with her, and admits that her daughter Jennie was registered in school under the name of Jennie Curtis, went by that name and was called by some children, though not all, Jennie Curtis. The children, during this time, visited very frequently at the home of appellant's parents and called them grandpa and grandma. Appellant's step-mother, his own mother being dead, frequently visited appellee and her children when they resided on Congress street and on Lake street, and after appellant abandoned appellee, and when she resided upon Randolph street, and frequently brought them presents of oranges, fruit, picture books and other things. She, appellant's step-mother, was also present on the occasion of the birth of one of the children, Grace, February 24, 1879, at the request of appellant, while they were residing at 286 West Congress street. She also went

with appellee and her oldest child, Jennie, and was present when the latter was confirmed at the cathedral of St. Peter and St. Paul.    Appellant's father, it appears, was sick during this period and did not visit appellee and her children.    The child born in August, 1875, was a son, was named Charles G. Hutchinson, (the same name as his father,) and has always been known and called by that name without any objection or remonstrance of any kind on the part of appellant, so far as shown by the record.    He was at the time of the trial by profession a lawyer.    From time to time after appellant abandoned appellee and his children, the two older children, Jennie and Charles G., frequently went to their father, being sent by their mother, to get assistance from him, which he gave at different times, but neither of these children, though the former was thirty years of age and the latter twenty-three years at the time of the filing of the bill, knew that their parents had never been formally married until appellant filed his answer.    Then for the first time, and from the answer, did they know that appellant claimed he was not legally married to appellee.    These two young people certainly knew what was the ostensible relation between appellee and appellant while they lived on Lake street, and the elder knew what it was when their home was on Congress street for about seven years.    After appellant's desertion of appellee she says that she often asked him to return to and live with her, and he as often promised he would, but he never gave her, as she says, any satisfaction as to why he went away.    He contributed, after the desertion, to the support and maintenance of appellee and the children different amounts, ranging from $35 to $50, about a year apart, but appellee says 'he didn't give on an average a year enough for one child to live on.'    Appellant, according to his own testimony, is a man of large wealth and worth more than $275,000, besides numerous Chicago city lots and buildings thereon, and several large farms,

though he says that he never provided in any manner for the two older children. He says he never gave any of the children money when he was living on Lake street.

"Shortly before appellee went to live on Congress street, Frank Schuneman, who was in the coal business and subsequently married her niece, went to appellee's father's home in regard to coal, and says that appellee introduced appellant to witness as her husband; that witness talked with appellant with regard to coal, and appellant said: 'After we get settled we may want some coal also, and if you treat us right we shall patronize you—just as soon as we get settled; we were recently married; I shall need wood and coal, and we shall probably give you a call, provided you treat us right.' He further testified that later on he did receive an order from Mr. Hutchinson for wood and coal, and during 1875 and the following years,—as witness thinks, to 1882,— he took coal to 286 West Congress street quite a number of times; that sometimes he saw Mr. Hutchinson there, probably lying on the lounge asleep; sometimes he would be up. He also produced his books of account, which, during the year 1881, at different times showed charges of coal and credits of cash under the heading of 'Hutchinson, 286 Congress street.' The witness' books prior to 1881 had been destroyed by fire. He also saw Mr. Hutchinson at 365 Lake street when he visited the Hutchinson family there. He testified, on cross-examination, that when he was introduced to Mr. Hutchinson that was the first time witness ever met him; that he knew appellee and her parents before that time, and knew that she had had a child, Jennie, whose father he heard was Mr. Hutchinson, though he didn't know, at the time of the introduction, whether she was a married woman or not. He also says that sometimes other children called this child Jennie Curtis, but she was known as Jennie Hutchinson more. This child, Jennie, was known and registered in one school that she attended as Jennie Curtis,

and in another school she was registered as Jennie Hutchinson. She testified in this case (having been married) under the name of Jennie Schutte, and explains in her evidence that she reported to her mother that she was called Jennie Curtis in school; that her mother said it was a mistake, and just as soon as she was able she would have it changed. She also says she was registered at the Skinner school in Chicago, as late as 1883 and 1884, under the name of Jennie Curtis, and that it was prior to that time, in the Carpenter school, that she was registered as Jennie Hutchinson. Mrs. Emily Southwell, who knew the Hutchinsons when they resided on Congress street and who visited them there a number of times, testified, in substance, that one night she was sleeping with Mrs. Hutchinson when Mr. Hutchinson came home when he was not expected, and that witness had to go into another room and sleep with the children; that she was not there at meal time, but saw Mr. Hutchinson there in the day time. Priscilla Baldwin, who was a roomer at appellee's house when she lived on Lake street, says she first met Mr. Hutchinson there; that he came to her door, which was the front room of the house, on one occasion and asked for Mrs. Hutchinson; that witness replied, 'She is not in, I believe; did you wish to see her?' He said, 'Yes, she is my wife.' This witness testified that on another occasion when she was at a meal with Mr. and Mrs. Hutchinson and the children, 'I picked up one of the children and I said to Mr. Hutchinson, 'You have very lovely children and a good wife,' and he said, 'I have a good wife.' Q. 'Go ahead.' A. 'Very lovely children.' She also says that she lived in the family most of the time for three years, and during that time Mr. Hutchinson came and went at intervals; that 'he came and went from the house as any man does at home.' Also, that she was introduced by appellee to Mr. Hutchinson as appellee's husband; that appellee used the words, 'my husband.'"

Counsel for appellant so strenuously insist that the contention of the appellee that a valid present contract of marriage was entered into in 1875 was disproved by the testimony of Mary Tiffany and also by an instrument signed by the appellee in her maiden name in 1892, that we feel some reference should be made to such alleged countervailing testimony.

On cross-examination counsel for appellant asked appellee, in substance, in a question framed as for purposes of impeachment, if she did not, on one occasion, in 1883, go to the back door of the home of the appellant's step-mother, and in the presence of said Mary Tiffany, in reply to a statement of appellant's step-mother that she (the step-mother) was sorry to see her (the appellee) there again and that appellant would listen to nothing that she (the step-mother) might say to him, say, "If you would only have him marry me for my children." The appellee denied that she made such statement to the step-mother of appellant. Mrs. Emily Southwell, a witness for the appellee, whose testimony is referred to in the extract from the opinion of the Appellate Court, was asked, on cross-examination, by counsel for the appellant, if at one time, when she and Mary Tiffany were looking at some pictures in an album, she did not say to Mary Tiffany that she had never seen the appellant in the house where the appellee lived, at 286 West Congress street. Mrs. Southwell denied that she made the statement. Mary Tiffany was introduced as a witness for the purpose of impeaching these statements of the appellee and Mrs. Southwell. She answered the impeaching questions in the affirmative. But it did not follow that the chancellor should have accepted the testimony of this one witness as establishing the falsity of the statements of two other witnesses. That she gave testimony in absolute contradiction of that of the appellee and Mrs. Southwell logically operated to weaken the effect of her testimony as against each and either of them.

In 1892 the appellee received the sum of $4100 from the appellant and signed the following instrument:

"Office of James Maher, Attorney and Counselor. Room 14, 79 Clark street, Chicago, October 13, 1892.

"I, Jennie Curtis, of the city of Chicago, county of Cook, and State of Illinois, do hereby certify that I have this day received of Charles G. Hutchinson the sum of forty-one hundred ($4100) dollars in full of all demands I have or may have against the said Charles G. Hutchinson by reason of past relations or for any cause whatever; and I further certify that in consideration of the payment of the above sum, the receipt of which I hereby acknowledge, I have on this date freely discharged and released the said Charles G. Hutchinson from any and all claims and obligations to me.                    JENNIE CURTIS."

"I, James Maher, do hereby certify that the above agreement was drawn up by me and was freely signed by Jennie Curtis in my presence after being by her read, the said Charles G. Hutchinson not being present at the signing thereof.
                                   JAMES MAHER."

When the paper was signed the appellee was in sore need of money for the purpose of maintaining and supporting herself and providing for the children of herself and the appellant. She testified she so informed the appellant, and told him at many different times she could not meet the expenses of the family without more assistance from him; that she would like to have a home for herself and their children and be relieved of the expense of paying rent; that he finally told her to meet him at the corner of Clark and Randolph streets, in the city of Chicago, and he would make some provision for her; that she and their daughter Jennie (now Mrs. Schutte) met him at the appointed place, and that after some conversation between them he told her he would give her $4100,—$4000 thereof to be used in buying a home and $100 to buy a horse and buggy for their son, Charles; that he took them to some office,—she did not know whose office it was,—where the money was to be paid. She and her daughter both testified that after they arrived at the office, or just as they entered the office, the

appellant, in response to a remark made by their daughter, Jennie, to him with reference to a watch which the daughter contended the father had promised to give her, made a reply so highly indecent and insulting (wholly unfit to be here recited) that both mother and daughter became greatly agitated and began to weep and cry, whereupon appellant went away from the office; that a man whom they now recognized as one of appellant's counsel, Mr. Maher, came up to them and said to her and the daughter, "Come this way, please," and then presented the paper which had been previously prepared, and said to the appellee, "Sign this paper and sign with your maiden name;" that the appellee was greatly excited and agitated and did as directed without reading the paper or hearing it read, and that Mr. Maher paid her the money. Mr. Maher, counsel for appellant, also appeared as a witness for the appellant, and gave testimony contradictory, in some material respects, to that of appellee and her daughter as to the occurrences in his office, but he did not deny that he directed her to sign her maiden name nor that she was laboring under great excitement and weeping at the time. He was acting as counsel for appellant when the instrument was signed, and was of counsel in the same behalf on the hearing of the case in the trial court at the time he also appeared as a witness. The contents of the paper, and the fact she attached her maiden name to it, are in a degree inconsistent with her version of the relations which previously existed between herself and appellant, but not by any means of such great weight and force as to overturn her sworn testimony and the mass of other testimony to which it seems to be opposed. If signed under the circumstances detailed by the appellee and her daughter, the instrument was entitled to but little weight in arriving at the true relation which the appellant and the appellee bore to each other in the previous years of their lives. If the relation of lawful marriage had actually

been created and in fact existed, the subsequent admission of appellee to the contrary, no matter if solemnly and deliberately made, would have no effect to dissolve the marriage tie or to relieve the appellant from the obligations and duty of a husband and father.

A circumstance of perhaps not less weight tended to establish an admission on the part of the appellant that the status of marriage existed between himself and the appellee. The appellant loaned a sum of money to one Charles M. Miller, and to secure the same Miller conveyed to the appellant the absolute title to certain real estate in Cook county, taking back an agreement to re-convey the title to the property to Miller upon re-payment of the loan. Miller testified that in 1896 he said to the appellant, "Your brother George (since deceased) tells me you are married and have a wife and four children," and that appellant answered: "Well, I have; what of it? what is it to you?" I said, "It is a good deal to me, for it involves the title to the property which you hold— the property in which I live." Two letters written by the appellant in response to letters written him by Miller in relation to the ability of the appellant to re-convey full and clear title to the property to Miller were produced in evidence. In neither of the letters is there a denial of the statement which Miller testified George Hutchinson, appellant's brother, made to him to the effect appellant was a married man, which statement is repeated in substance in the letter and an answer thereto demanded, but in each letter the truth or falsity of the statement is entirely ignored.

The bill was not filed until 1898. The history of the lives of appellant and appellee and their children during the six years which intervened between the payment of the sum of $4100 and the filing of the bill is but vaguely developed by the proofs. The appellant contributed but little to the wants of his wife and children, but he provided money to pay for a silk dress for their daughter

Jennie and paid for a suit of clothes for their son, Charles. The wife conducted a boarding house, and with the assistance of their son, Charles G., who was clerk for some years in the post-office, the family was maintained and the children were kept in school. Our conclusion is, all of the elements necessary to a valid common law marriage,—a contract *per verba de presenti*, followed by cohabitation matrimonial in character and intent and a full assumption of the marriage status in every legal aspect, —were established by the proofs. (*Port* v. *Port*, 70 Ill. 484; *Elzas* v. *Elzas*, 171 id. 632; *Cartwright* v. *McGown*, 121 id. 388; *Laurence* v. *Laurence*, 164 id. 367; *Robinson* v. *Ruprecht*, 191 id. 424.) The abandonment of the wife and children was shown to be without just cause.

The equities were with the appellee, and the decree is eminently just and proper. It is affirmed.

*Decree affirmed.*